UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

ROBERT G. FRANCE,

                                   Plaintiff,

            v.

CORRECTON OFFICER ELGIN MORTON,

                                   Defendant.

No. 12-CV-5576 (KMK)

<u>OPINION & ORDER</u>

<u>Appearances:</u>

Robert G. France
Wallkill, NY
*Pro Se Plaintiff*

Irma W. Cosgriff, Esq.
Reginald J. Johnson, Esq.
White Plains, NY
*Counsel for Defendant*

KENNETH M. KARAS, District Judge:

       Pro se Plaintiff Robert G. France ("Plaintiff"), formerly detained at Westchester County

Jail, brought this Action against Correction Officer Elgin Morton ("Defendant"), alleging that he

used excessive force against Plaintiff in violation of his Fourteenth Amendment rights. (*See*

Second Am. Compl. (Dkt. No. 55).)  Before the Court is Defendant's Motion for Summary

Judgment.  (Notice of Mot. For Summ. J. (Dkt. No. 118).)  For the following reasons, the Motion

is granted.

## I. Background

### A. Factual Background

The following facts are taken from the documents submitted and Defendant's statement

pursuant to Local Civil Rule 56.1, (Def.'s Rule 56.1 Statement ("Def.'s 56.1") (Dkt. No. 120)),

and are recounted "in the light most favorable to" Plaintiff, the non-movant.[1] *Wandering Dago,*

---

[1] Local Civil Rule 56.1(a) requires the moving party to submit a "short and concise statement, in numbered paragraphs, of the material facts as to which the moving party contends there is no genuine issue to be tried." The nonmoving party, in turn, must submit "a correspondingly numbered paragraph responding to each numbered paragraph in the statement of the moving party, and if necessary, additional paragraphs containing a separate, short[,] and concise statement of additional material facts as to which it is contended that there exists a genuine issue to be tried." Local Civ. R. 56.1(b). "A pro se litigant is not excused from this rule," *Brandever v. Port Imperial Ferry Corp.,* No. 13-CV-2813, 2014 WL 1053774, at *3 (S.D.N.Y. Mar. 13, 2014) (italics omitted), and "[a] nonmoving party's failure to respond to a Rule 56.1 statement permits the court to conclude that the facts asserted in the statement are uncontested and admissible," *T.Y. v. N.Y.C. Dep't of Educ.,* 584 F.3d 412, 418 (2d Cir. 2009); *see also Biberaj v. Pritchard Indus., Inc.,* 859 F. Supp. 2d 549, 553 n.3 (S.D.N.Y. 2012) (same). Here, Defendant filed and served his statement pursuant to Rule 56.1, (Dkt. No. 120), and filed and served a statement notifying Plaintiff of the potential consequences of not responding to the Motion, as required by Local Rule 56.2, (Dkt. No. 122). Despite this notice, Plaintiff failed to submit a response to Defendant's 56.1 Statement of Facts. Accordingly, the Court may conclude that the facts in Defendant's 56.1 Statement are uncontested and admissible. *See Brandever,* 2014 WL 1053774, at *3 (concluding that because the pro se plaintiff did not submit a Rule 56.1 statement in response to the defendant's statement of facts, "there [were] no material issues of fact"); *Anand v. N.Y. State Div. of Hous. & Cmty. Renewal,* No. 11-CV-9616, 2013 WL 4757837, at *7 (S.D.N.Y. Aug. 29, 2013) (same). Indeed, Plaintiff did not even file any opposition papers containing "statements and documents" that the Court could consider. *Berry v. Marchinkowski,* 137 F. Supp. 3d 495, 503 n.1 (S.D.N.Y. 2015).

Nevertheless, in light of the "special solicitude" afforded to pro se litigants "when confronted with motions for summary judgment," *Graham v. Lewinski,* 848 F.2d 342, 344 (2d Cir. 1988), the Court will "in its discretion opt to conduct an assiduous review of the record," including Plaintiff's deposition testimony, when deciding the instant Motion. *Holtz v. Rockefeller & Co.,* 258 F.3d 62, 73 (2d Cir. 2001); *see also Houston v. Teamsters Local 210, Affiliated Health & Ins. Fund-Vacation Fringe Ben. Fund,* 27 F. Supp. 3d 346, 349 (E.D.N.Y. 2014) ("Although plaintiffs did not file a Rule 56.1 statement, the Court has independently reviewed the record to ensure that there is uncontroverted evidence to support the paragraphs referenced in defendants' Rule 56.1."); *Cherry v. Byram Hills Cent. Sch. Dist.,* No. 11-CV-3872, 2013 WL 2922483, at *1 (S.D.N.Y. June 14, 2013) (italics omitted) ("[W]here a pro se plaintiff fails to submit a proper . . . Rule 56.1 statement in opposition to a summary judgment motion,

*Inc. v. Destito*, 879 F.3d 20, 30 (2d Cir. 2018) (internal quotation marks omitted). The facts as described below are not in dispute, except where indicated.

At the time of the relevant events, Plaintiff was a pre-trial detainee at Westchester County Jail. (Decl. of Irma W. Cosgriff, Esq. ("Cosgriff Decl.") Ex. 4 ("Pl.'s Dep.") 16 (Dkt. No. 119); Def.'s 56.1 ¶ 6.) He was designated to the 1-G Block, which housed inmates with mental health issues. (Def.'s 56.1 ¶ 11; Pl.'s Dep. 55.) On August 12, 2011, Defendant was partnered with Correction Officer Steve Coaxum ("Coaxum") to conduct searches of inmate cells in the 1-G block as "a Special Search Team." (Def.'s 56.1 ¶ 13.) Defendant contends that this was part of a "routine, random search of the 1-G Block," done "to ensure the safety of other inmates and staff from contraband," (*id.* ¶¶ 11–12), but Plaintiff claims that "[i]t looked like [his] cell was targeted," (Pl.'s Dep. 79).

At approximately 7:12 am, Defendant and Coaxum, along with other officers paired in teams, began searching all of the cells in 1-G. (*See* Cosgriff Decl. Ex. 7 ("Camera 7").)[2] At approximately 7:18:10 am, Defendant and Coaxum approached Plaintiff's cell door. (Def.'s 56.1 ¶ 17; Camera 7 at 7:18:10 am (showing an officer in the back right of the hallway approach the

_____

the [c]ourt retains some discretion to consider the substance of the plaintiff's arguments, where actually supported by evidentiary submissions." (internal quotation marks omitted)); *Pagan v. Corr. Med. Servs.,* No. 11-CV-1357, 2013 WL 5425587, at *2 (S.D.N.Y. Sept. 27, 2013) (explaining that "[t]he [c]ourt ha[d] considered the [motions for summary judgment] in light of the entirety of the record to afford [the pro se] [p]laintiff the special solicitude to which he [was] entitled" where the plaintiff failed to submit a Rule 56.1 response).

[2] Defendant states that these searches began at approximately 7:05 am, but the cited video does not show officers entering the 1-G block until closer to 7:07 am. (*Compare* Def.'s 56.1 ¶ 16 *with* Camera 7 at 7:07:33 am.) And, no officers actually return to begin searching individual cells until closer to 7:12:32 am. (*See* Camera 7 at 7:12:32 am.)

furthest door on the left from the camera angle).)[3]  The sliding door to Plaintiff's cell then

opened.  (Def.'s 56.1 ¶ 17; Pl.'s Dep. 103.)  At this point, the Parties' versions of events diverge.

### 1.  Defendant's Version and the Video

Defendant contends, and the video shows, that he handcuffed Plaintiff in his cell and

"backed him out of his cell without incident," (Def.'s 56.1 ¶ 18; Camera 7 at 7:18:40 am; *see*

*also* Pl.'s Dep 109 (testifying that he was handcuffed "[i]mmediately" upon leaving his cell).)[4]

Coaxum then entered Plaintiff's cell to search it.  (Def.'s 56.1 ¶ 18.)  While Coaxum searched,

Defendant stood in the hallway outside of Plaintiff's cell, where he directed Plaintiff to face the

wall until the search was complete and pat frisked Plaintiff, beginning at 7:19:36 am.  (*Id.* at

¶ 19; Camera 7 at 7:19:36 am.)[5]  As of approximately 7:20:20 am, Plaintiff was the only detainee

---

[3] Defendant relies heavily on video footage captured by a stationary camera in 1-G block to support his version of events.  (*See* Camera 7.)  Plaintiff does not contest the authenticity of this video.  While the Court considers the video when deciding the instant Motion, it notes that the video is somewhat blurry and captures the entire 1-G block at the time of events, rather than only the interaction between Plaintiff and Defendant.  There are other officers and inmates in the hallway at the same time, none of whose faces can be seen with great clarity, and Defendant does not identify with particularity which two people in the video are Plaintiff and Defendant.  However, because Defendant cited to specific time-stamps in the video, which Plaintiff does not dispute, the Court can identify which of the two (albeit blurry) figures are Plaintiff and Defendant.  At the very least, the Court can identify Plaintiff as of approximately 7:20 am, when only one inmate remains in the hallway.  (Camera 7 at 7:20:20 am.)  In any event, even if it is not clear which of the inmates and officers are Plaintiff and Defendant, respectively, the video footage *is* clear enough to show the amount of time each inmate was in the hallway, how each was generally positioned, and whether there were any altercations involving a significant amount of force.

[4] It is undisputed that Defendant handcuffed Plaintiff, although when, where, and how tightly is disputed, as discussed later in Plaintiff's version of events.  (*See, e.g.*, Pl.'s Dep. 72 ("[Defendant] was the one that handcuffed me.").

[5] The video is blurry, and Plaintiff and Defendant are the furthest figures from the camera, but it is possible to see vague patting and touching occurring.  (*See* Camera 7 at 7:19:36 to 7:19:50 am.)  Similarly, although Defendant contends that it is undisputed that he was "standing at least 2 feet behind Plaintiff" at 7:19:50 am, the Court finds it difficult to see that with certainty.  (*See* Camera 7 at 7:19:50 am.)  But, it is possible to see that Defendant made no

still in the hallway, he was not touching the wall, and no officers were closer than a few feet away from him.  (Camera 7 at 7:20:20 am.)  At approximately 7:21:26 am, Coaxum completed the search of Plaintiff's cell and Defendant directed Plaintiff back into his cell, ordering him to stand at the foot of the bed so that Defendant could remove his handcuffs.  (Def.'s 56.1 ¶ 20; Camera 7 at 7:21:26–7:21:32 am.)  Plaintiff walked into his cell still wearing handcuffs, while Defendant stood in the doorway.  (Camera 7 at 7:21:26–7:21:32 am.)

Defendant "removed Plaintiff's left handcuff," and then "ordered [Plaintiff] to place his left hand on top of his head."  (Def.'s 56.1 ¶ 21.)  Plaintiff "kept his left arm down by his left side, ignoring [Defendant's] order."  (*Id.*)[6]  Plaintiff asked "why in the hell are you motherfuckers searching my cell?"  (*Id.*)  Defendant "repeated his order again, this time loudly[,] to Plaintiff, to place his left hand on top of his head."  (*Id.*)  "During this exchange, [Defendant] maintained control of Plaintiff's right arm which was still cuffed and behind his back."  (*Id.*)  Although the video does not capture these events, which transpired inside Plaintiff's cell, it shows that Defendant was positioned in the doorway of Plaintiff's cell until approximately 7:21:57 am.  (Camera 7 at 7:21:26–7:21:57 am; *see also* Def.'s 56.1 ¶ 21.)

"Plaintiff made a sudden turn to the right towards [Defendant] while raising his left arm above his head with a clenched fist."  (Def.'s 56.1 ¶ 22.)  "In order to prevent injury, [Defendant] placed his left forearm on Plaintiff's upper back and used . . . physical force to guide Plaintiff

_____

quick or extravagant movements, as all of the officers on the video in the hallway are moving quite slowly and do not appear to be standing close to the inmates facing the wall.

[6] Defendant states that "Plaintiff was acting in a passive resistant manner."  (Def.'s 56.1 ¶ 21.)  The Court is unsure whether this a term of art used by correction officers or merely a legal conclusion.

face down to the bed that was directly in front of him." (*Id.*)[7] "Once Plaintiff was on the bed, [Defendant] grabbed Plaintiff's left arm with his left hand and ordered him to put his left hand behind his back." (*Id.*) However, Plaintiff "actively resisted" by "tens[ing] his left arm to attempt to prevent [Defendant] from handcuffing him." (*Id.*; *see also* Cosgriff Decl. Ex. 8 ("Diaz Aff.") ¶ 4.) During this interaction, at approximately 7:22 am, Captain Marcelo Diaz, the Sergeant Supervisor in charge of the floor including 1-G Block, "entered Plaintiff's cell where [he] observed Plaintiff's non-compliance with the orders of [Defendant]." (Diaz Aff. ¶ 4; *see also* Camera 7 at 7:22 am.) Diaz "also gave Plaintiff an order to comply and place his hand behind his back." (Diaz Aff. ¶ 4.) Defendant "then reapplied the left handcuff and maintained control of Plaintiff." (Def.'s 56.1 ¶ 22; *see also* Diaz Aff. ¶ 4.)

Meanwhile, also at approximately 7:22 am, "an officer-needs-assistance alarm," also known as a "code signal 13," was sounded to call the facility's Emergency Response Team ("ERT"). (Def.'s 56.1 ¶¶ 24–25; Diaz Aff. ¶ 4.) These alarms summoning ERT are intended "to ensure the safety of staff members and inmates and, if necessary, restore order to the area." (Def.'s 56.1 ¶ 26.) "During any ERT activation, an officer accompanies ERT to the incident area equipped with a handheld video camera . . . to document the response." (*Id.* ¶ 27.) Accordingly, at approximately 7:23:22 am, ERT responded to the call and arrived at Plaintiff's cell. (Camera 7 at 7:23:22 am; Diaz Aff. ¶ 4.)[8] Correction Officer Raymond Valles arrived with ERT to

---

[7] Defendant claims he "used the minimal necessary physical force" to do this. (Def.'s 56.1 ¶ 22.) This is a legal conclusion which presupposes the result of this lawsuit. However, it is undisputed that Westchester County Department of Corrections policy "provides guidelines and procedures for staff when they are confronted with a situation where physical force may be required," including when it is appropriate to use force and how much it is appropriate to use. (*Id.* ¶ 24; *see also* Cosgriff Decl. Ex. 10 ("WCDOC Policy No. 18-02").)

[8] Defendant's 56.1 Statement incorrectly states that ERT responded at 7:22 am, but that was when the alarm sounded. (Def.'s 56.1 ¶ 28.)

operate the handheld video camera. (Def.'s 56.1 ¶ 28.) "As soon as ERT arrived and took control of Plaintiff, [Defendant] exited the cell." (*Id.* ¶ 23; *see also id.* ¶ 30 ("As soon as ERT arrived at Plaintiff's cell, [Defendant] (and [Coaxum]) left and ERT took control."); Camera 7 at 7:23:27 am (showing officers leaving Plaintiff's cell after the ERT went in).) Less than 2 minutes elapsed from the time Plaintiff entered his cell—around 7:21:26 am—until ERT arrived, at 7:23:22 am. (Def.'s 56.1 ¶ 23; *see also* Camera 7 at 7:21:26–7:23:22 am.)

"When ERT arrived, Plaintiff was fully clothed and handcuffed behind his back lying face down on his bed in his cell." (Def.'s 56.1 ¶ 30.) "ERT placed restraints on [Plaintiff's] legs and he was escorted outside to the hallway while a search of his cell was conducted[,] which produced negative results." (*Id.*; *see also* Camera 7 at 7:23:56 am (showing Plaintiff leaving his cell).) The ERT officer who placed the leg restraints on Plaintiff and escorted him into the hallway was officer Salvatore Ficarrotta, (Cosgriff Decl. Ex. 13 ("ERT Video 2") at 0:30–0:41; *see also id.* Ex 9 at 507 (incident narrative report stating that "Ficarrotta . . . placed leg restraints on [Plaintiff's] person and was escorted outside of cell while a search of cell was conducted").)[9] While in the hallway, ERT faced Plaintiff against the wall, while Plaintiff "was cursing and saying . . . 'there was no reason for them to do this.'" (Def.'s 56.1 ¶ 31; *see also* Camera 7 at 7:24:04 am (putting Plaintiff against the wall); Cosgriff Decl. Ex. 13 ("ERT Video 1") at 1:11–2:15 (showing Plaintiff on the wall and telling the ERT officer holding him in place that he had previously had knee surgery and a broken hand, that there was "no reason for [them] to do this," and later, that "there's no reason for you to be pushing me up like a mother fucking dog").)

---

[9] Defendant submitted the handheld video taken by Officer Valles. (Cosgriff Decl. Ex. 13.) The disc contains two video files: (1) the actual video footage of the incident between ERT and Plaintiff, which the Court will call "ERT Video 1," and (2) a video taken immediately after the incident in which an officer reads a report of the incident, which the Court will call "ERT Video 2." (*Id.*) Plaintiff does not contest the authenticity of these videos.

"Plaintiff was directed to quiet down." (Def.'s 56.1 ¶ 31; *see also* ERT Video 1 at 1:47–1:51

(ERT officer stating "Nobody's doing anything, be quiet.").)

"ERT and Plaintiff were in the hallway for approximately one minute and then Plaintiff

was guided back into his cell[,] where ERT gave him orders to comply and removed his

restraints." (Def.'s 56.1 ¶ 31; *see also* Camera 7 at 7:25:09–7:25:14 (showing Plaintiff walking

back into his cell); ERT Video 1 at 1:11–2:15 (standing in hallway against the wall); *id.* at 2:16

("Get on the bed."); *id.* at 2:20–2:24 ("Listen, I can't take the leg ties off—on the bed.").)

"Plaintiff was standing facing the wall in his cell and given orders to take his clothes off so that

he could be searched for contraband, weapons and any visible injuries, all with negative

findings." (Def.'s 56.1 ¶ 31; *see also* ERT Video 1 at 2:43–3:01, 3:32–3:39 (telling Plaintiff

someone would remove his restraints and that failure to comply with ERT orders would be

considered "an act of aggression" and would result in force being used); *id.* at 4:08–5:43

(instructing Plaintiff to undress and take other actions so that the ERT officers could search him,

and showing that Plaintiff complied).) "After the search was completed, Plaintiff was directed to

lay face down on his bed and ERT left his cell." (Def.'s 56.1 ¶ 31; ERT Video 1 at 5:43–6:05

(same).) The ERT was inside Plaintiff's cell for approximately 3 and a half to 4 minutes, and the

last member of the ERT was out of the cell by approximately 7:29:02 am. (*See* Camera 7 at

7:28:46–7:29:02 am (showing ERT leaving Plaintiff's cell); ERT Video 1 at 2:16–6:00 (showing

ERT inside Plaintiff's cell).)

Per prison protocol, (*see* WCDOC Policy No. 18-02 at 527), an Alarm or Incident

Response and Use of Force Report ("UOF Report") was filed to document this incident. (Def.'s

56.1 ¶ 32.) Among other things, the report included statements, narratives, and reports from

officers on the scene, a Use of Force by Staff Report signed by Defendant, a disciplinary Report

signed by Defendant documenting that Plaintiff's "assaultive behavior" resulted in him being "segregated pending a disciplinary hearing," an Injury Report relating to Plaintiff's medical treatment, and an Inmate Statement Form submitted by Plaintiff. (*Id.* ¶ 32(A).)[10] The report indicates that (1) Captain John Gleason, the assigned shift commander, reviewed the entirety of the report's contents; (2) Assistant Warden Robert Doty conducted a further review of the incident and the associated documentation om August 15, 2011; (3) Westchester County Department of Correction's Use of Force Review Board then conduct a full review of all the submitted documentation, including both videos of the incident, on August 24, 2011, and determined that the staff members' actions "complied with existing department policy and procedure" and that the "[v]ideo evidence and officers reports refute [Plaintiff's] claim"; and (4) on August 26, 2011, Deputy Commissioner Wanda D. Smithson reviewed the Board's determination and accepted its findings. (*Id.* ¶ 32.)

### 2. Plaintiff's Version(s)

In the Complaint, Plaintiff alleged that he "was forced from his cell [and] forced on the wall" in the hallway, where Defendant "us[ed] excessive force upon him" by "twisting and choking [Plaintiff]," "slamming his face into [the] cell door," "picking [Plaintiff] up by the neck and twisting the handcuffs," and "roughly put[] [his] elbows and knees in [P]laintiff[']s back," and then other unspecified officers "helped [Defendant] drag Plaintiff into [his] cell . . . slamming his face again into [the] cell wall" and "choking him with elbows and knees in his back." (Second Am. Compl. 5 ¶ 3.) However, Plaintiff's version of events changed throughout his deposition, such that it is unclear whether the alleged assault took place inside or outside of

---

[10] Defendant quotes from Plaintiff's Inmate Statement Form, but the document does not appear in the exhibits provided to the Court. (*See* Def.'s 56.1 ¶ 33 n.9 (citing Ex. 9 at 514, which is missing from Ex. 9).)

his cell and who else was with Defendant when it occurred. Indeed, Plaintiff does not distinguish between the incident involving Defendant and the one involving the ERT, and at times indicates that Defendant was a member of the ERT. However, he consistently insists he did not refuse to obey any orders. (*See* Pl.'s Dep. 75 ("I didn't refuse anything."); *id.* at 97 ("There was a . . . false report claiming that I didn't follow an order or something."); *id.* at 110 ("I was compliant. I didn't break any rule.").)

Initially, Plaintiff testified that Defendant arrived at his cell with the ERT—or, as he calls them, "the turtles"—and they immediately attacked him. (*Id.* at 59 (testifying that Defendant "attacked [him]" upon walking into his cell for the search); *id.* at 56 (claiming that multiple "officers came to [his] cell and just started roughing [him] up"); *id.* at 79 (testifying that the turtles "came the same time [Defendant] did" and stayed "[t]he entire time").) According to Plaintiff, these officers were members of "[t]he special turtle unit" and "came with shields and helmets" to his cell, where they "told [Plaintiff] to get on the wall." (*Id.* at 56.) Then, after Plaintiff "got on the wall," "the guy"—who he identifies as Defendant—started "pushing [his] head against the wall." (*Id.* at 56–57; *see also id.* at 57–58 (testifying that Defendant was an ERT turtle, and "was with the turtle unit"); *id.* at 59–60 (testifying that Defendant entered Plaintiff's cell "[w]ith the turtles," who were "right behind him" and "with him"); *id.* at 60 ("I remember, he entered with the turtle crew."); *id.* at 61 ("[H]e came in with officers . . . [T]urtle unit."); *id.* at 71–72 (testifying that Defendant "was in charge of the turtles").) Defendant then "grab[bed] [Plaintiff] by the back of [his] neck," and when Plaintiff said he had injuries, Defendant "told [him] to shut the eff up," and "put[] elbows in [Plaintiff's] back, choking [him]."

(*Id.* at 57.)[11] Defendant "[p]ut . . . handcuffs [on Plaintiff]," "trying to break [Plaintiff's] arm" by twisting it, "and pick[ed] [Plaintiff] up by the handcuffs," with "assistance" from other officers. (*Id.*; *see also id.* at 113–14 (testifying that Defendant had him by the handcuffs and the neck, while the turtles picked him up by the leg irons and handcuffs).) Defendant told Plaintiff "to get undressed" and "[s]lammed [his] face into the wall when he was pushing [Plaintiff's] head against the wall." (*Id.* at 57.)

Later in his deposition, however, Plaintiff testified that when Defendant initially came to his cell, he said "[s]tep out your cell," without telling Plaintiff why, and Plaintiff complied. (Pl.'s Dep. 103–04; *see also id.* at 60 (testifying that Defendant "[a]sked [Plaintiff] to step out" of the cell and Plaintiff "stepped out [of] the cell"); *id.* at 61 (testifying that Defendant entered his cell "[a]nd asked [Plaintiff] to step outside [his] cell").) Then, according to Plaintiff, Defendant "push[ed] [his] face on the wall and chok[ed] him." (*Id.* at 60; *see also id.* at 106 (testifying that Defendant kept Plaintiff "pressed against the wall" and choking him while others were "tearing up [Plaintiff's] cell").) Plaintiff said, "I have injuries. You don't have to do everything because I'm complying. Whatever you ask me to do," to which Defendant replied "'[s]hut the eff up." (*Id.* at 60*; see also id.* at 62 (testifying that Plaintiff said "You don't have to rough me up. I'm already injured," to which Defendant responded "[s]hut the eff up"); *id.* at 67 (testifying that once he told Defendant he didn't have to hurt him, Defendant said "[s]hut the eff up"); *id.* at 104 (testifying that outside the cell, Defendant made this comment and was "being

---

[11] As noted below, Plaintiff's testimony is inconsistent about when and where he was lifted by the neck and pushed on the wall. (*See* Pl.'s Dep. 74 (stating that this happened "both" inside and outside his cell); *id.* at 102–03 (testifying that Defendant grabbed him by the neck inside and outside his cell).) However, he later testified that Defendant picked him up by the neck and squeezed so hard that Plaintiff "couldn't pick [his] head up off the pillow," "you could see the bruises, "and his "neck was red." (*Id.* at 74.) And, he testified that his "whole face" was pushed into the wall while Defendant had him by the neck. (*Id.* at 76–77.)

rough"); *id.* at 110 (testifying that Defendant only said "[s]hut the eff up" to him while outside the cell during the turtles' search of his cell).) Plaintiff testified that, while "on the wall," Defendant "started roughing [Plaintiff] up." (*Id.* at 62). Specifically, Defendant "started choking [Plaintiff]," "[s]lammed [his] face against the wall[,] and told [Plaintiff] to be quiet." (*Id.*; *see also id.* at 64 ("[Defendant] smashed [Plaintiff's] head against the wall and against the cell gate.").) Then, Defendant handcuffed Plaintiff tightly, so he "couldn't do nothing" and "had gouges in [his] wrist," and took Plaintiff's arm "cast out of [his] cell." (*Id.* at 63–64.) The choking outside the cell occurred for "more than one minute." (*Id.* at 110–111.) And, Defendant stayed with Plaintiff the entire time while the search of his cell took place. (*Id.* at 106–07.)

Plaintiff's testimony is inconsistent about whether these events occurred inside or outside of his cell, but at times appears to emphasize it happened *both* inside and outside the cell. *See, e.g.*, *id.* at 63 (testifying that three other turtle officers watched this assault outside his cell); *id.* at 60 (testifying that this whole incident occurred "[i]n and out" of his cell and that Defendant "did the same thing in my cell that he did outside"); *id.* at 64 (testifying that the tight handcuffing "happened outside [his] cell," as did the smashing of his head "against the wall and . . . the cell gate"); *id.* at 74 ("This was outside my cell and inside my cell . . . Both."); *id.* at 76–77 (testifying that outside his cell, Defendant was smashing his face into the concrete wall); *id.* at 78 (testifying that his face was smashed against "the back wall of [his] cell").) Plaintiff testified that the assault outside his cell "lasted more than ten minutes" and that another officer was filming the "whole incident" with a hand-held video camera. (*Id.* at 67–68; *see also id.* at 107 (testifying that he "would think" it lasted for more than 10 minutes).)

Afterwards, the officers "took [Plaintiff] back in the cell," where Defendant held his "hand by the handcuff and by the leg cuff" and "[m]ade [Plaintiff] get undressed." (*Id.* at 68.)

The officers pushed Plaintiff's "mattress on the floor" and "pushed [Plaintiff] on the metal frame," where Defendant "got his hand on [Plaintiff's] neck and his elbow on [Plaintiff's] back." *Id.* at 69.) Defendant, after removing Plaintiff's handcuffs and holding Plaintiff "on the bed with a chokehold," "tried to . . . break [Plaintiff's] arm" by trying "to take [Plaintiff's] arm and make [his] hand touch the back of [his] head." (*Id.* at 69; *see also id.* at 78 (testifying that Defendant "initiated the violence[:] the elbow in [his] back, the twisting of [his] arm, the smashing of [his] face").) Plaintiff testified that at this point, Defendant "made [him] get up after that" and put his "face on the wall" at "the back of the cell," as he had previously testified. (*Id.* at 70; *id.* at 78 (testifying that Defendant pushed his face into "the back wall of [his] cell"); *but see id.* at 60, 62 (testifying that this occurred outside of the cell).)

### 3. Medical Attention & Injuries

Plaintiff was asked before the ERT left his cell and again afterwards whether he wanted medical attention, but he declined both times. (Def.'s 56.1 ¶ 31 & n.8.) Two hours after the incident, however, Plaintiff requested medical attention, and he was seen and evaluated that day. (*See id.*; *id* at ¶ 34; Pl.'s Dep 83.) The medical professionals he saw examined his wrist and said it "was red"; "the handcuff marks" and the areas "where the skin was shed" were visible. (Pl.'s Dep. 82.) Plaintiff also had bruising on his cheekbone. (*Id.* at 84–85.) The medical professional also examined Plaintiff's neck. (*Id.* at 84.) And, because Plaintiff claimed to have sustained a back injury from the incident, x-rays were taken of his spine. (Cosgriff Decl. Ex. 14 ("Pl.'s Medical Records") at 240.)[12] Plaintiff was at some point prescribed Motrin pills, although it is unclear what injury that prescription was meant to treat. (Pl.'s Dep. 84.) Otherwise, "no medication or treatment was administered." (Def.'s 56.1 ¶ 34.)

---

[12] Plaintiff's medical records were filed under seal. (*See* Dkt. Nos. 117, 124).

Plaintiff continued to request pain medication and various scans for his pain. (*See, e.g.*, Pl.'s Medical Records 250–255.) Plaintiff testified that he "was already injured, so [Defendant] just messed [him] up even more." (*Id.* at 83.) The pre-existing injury was a spinal cord injury, (*id.* at 31, 97), which he received from an earlier, unrelated assault, (*id.* at 32, 98). An x-ray taken of his cervical spine on August 16, 2011 revealed "mild degenerative changes" but "normal alignment" and "no fracture." (Def.'s 56.1 ¶ 38.) Similarly, x-rays of his thoracic and lumbar spine showed "scoliotic curvature" and "mild degenerative changes," but "no fracture." (*Id.*) Plaintiff also had a prior hand injury, which had required surgery, and a neck injury. (Pl.'s Dep. 98–99; Def.'s 56.1 ¶ 35 ("Plaintiff had hand, back and neck injuries prior to his incarceration at the WCDOC.").). After this incident, Plaintiff received "therapy for [his] neck and [his] back" and got "treatment for [his] hand." (Pl.'s Dep 100.) He also later sought mental health treatment, for this incident and previous ones, but the person he spoke with thought he did not "really need it." (*Id.* at 85.)

B.  Procedural History

Plaintiff commenced this Action by filing a Complaint on July 16, 2012 against Westchester County Correctional Jail, New York State Commission of Correction, Sergeant Susan Hubbard, Morton, Correction Officer Bradley Roane, Officer Christopher Lambert, Sergeant Francesco Imbrogno, and various unnamed defendants. (Dkt. No. 2.) On October 2, 2012, the Court dismissed Plaintiff's claims with respect to Westchester County Correctional Jail for failure to state a claim and with respect to New York State Commission of Correction on sovereign immunity grounds. (Dkt. No. 6.) The Court also directed the Clerk of Court to add the County as a Defendant under Federal Rule of Civil Procedure 21. (*Id.*) On July 31, 2013,

the Court dismissed the Action without prejudice as to Imbrogno and Lambert, whom Plaintiff still had not served.  (Dkt. No. 21.)

After receiving multiple extensions of time to file an amended complaint, (*see* Dkt. Nos. 32, 35, 37, 44), Plaintiff filed an Amended Complaint on November 24, 2014, naming more than 90 defendants and listing the docket numbers of three other cases that had already been dismissed.  (Dkt No. 46.)  On December 17, 2014, the Court dismissed the Amended Complaint for failure to comply with Federal Rule of Civil Procedure 8.  (Dkt. No. 48.)  On March 24, 2015, Plaintiff filed a Second Amended Complaint, naming more than 20 defendants.  (Dkt. No. 55.)  The remaining Defendants who had been served—the County, Sergeant Hubbard, and Correction Officers Morton and Roane— filed a Motion to Dismiss, (*see* Dkt. Nos. 65–67), which Plaintiff did not oppose.  On March 30, 2016, the Court issued an Opinion & Order granting the Motion to Dismiss with prejudice as to all Defendants except Morton.  (Opinion & Order (Dkt. No. 74).)  On May 3, 2016, Plaintiff filed a Motion for Reconsideration, (Dkt. No. 77), which the Court denied, (Dkt. No. 84).  Morton filed an Answer on May 16, 2016.  (Dkt. No. 80.)  The Court held a status conference on August 25, 2016, at which a discovery schedule was set, (*see* Docket (entry for Aug. 25, 2016)), and conferences again on February 10, 2017, (*see id*. (entry for Feb. 10, 2017)), and April 18, 2017, (*see id.* (entry for Apr. 18, 2017)). Plaintiff filed another Motion for Reconsideration of the Court's Opinion & Order on May 4, 2017, (Dkt. No. 104), which the Court denied, (Dkt. No. 108).

On May 5, 2017, Defendant Morton, the only remaining Defendant, filed a pre-motion letter explaining the grounds on which he would move for summary judgment.  (Dkt. No. 101.) Pursuant to a briefing schedule set by the Court, (*see* Dkt. Nos. 109, 114), Defendant filed a Motion for Summary Judgment, along with a Rule 56.1 statement and accompanying papers, on

August 24, 2017, (*see* Dkt. Nos. 118–121). Defendant also filed and served a statement notifying Plaintiff of the potential consequences of not responding to the Motion, as required by Local Rule 56.2. (Dkt. No. 122). On October 20, 2017, Defendant filed a motion to deem the Motion for Summary Judgment Unopposed. (Dkt. No. 125.) On October 23, 2017, the Court gave Plaintiff "one last 30-day extension to file his opposition papers." (Dkt. No. 127). On November 13, 2017, Plaintiff sent a letter to the Court requesting a 30-day extension to respond to an unidentified petition for certiorari. (Dkt. No. 128.) The Court stated in a memo endorsement that "[t]he Court is unclear about what Plaintiff is referring to" and that "Plaintiff [should] explain further by [November 30, 2017]." (Dkt. No. 129.) Plaintiff did not respond this Order and has since had no communication with the Court.

## II. Discussion

### A. Standard of Review

Summary judgment is appropriate where the movant shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Psihoyos v. John Wiley & Sons, Inc.*, 748 F.3d 120, 123–24 (2d Cir. 2014) (same). "In determining whether summary judgment is appropriate," a court must "construe the facts in the light most favorable to the non-moving party and . . . resolve all ambiguities and draw all reasonable inferences against the movant." *Brod v. Omya, Inc.*, 653 F.3d 156, 164 (2d Cir. 2011) (internal quotation marks omitted); *see also Borough of Upper Saddle River v. Rockland Cty. Sewer Dist. No. 1*, 16 F. Supp. 3d 294, 314 (S.D.N.Y. 2014) (same). "It is the movant's burden to show that no genuine factual dispute exists." *Vt. Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004); *see also Berry*, 137 F. Supp. at 521 (same).

"However, when the burden of proof at trial would fall on the nonmoving party, it ordinarily is sufficient for the movant to point to a lack of evidence to go to the trier of fact on an essential element of the nonmovant's claim," in which case "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." *CILP Assocs., L.P. v. Pricewaterhouse Coopers LLP*, 735 F.3d 114, 123 (2d Cir. 2013) (alteration and internal quotation marks omitted). Further, "[t]o survive a [summary judgment] motion . . . , [a nonmovant] need[s] to create more than a 'metaphysical' possibility that his allegations were correct; he need[s] to 'come forward with specific facts showing that there is a genuine issue for trial,'" *Wrobel v. County of Erie*, 692 F.3d 22, 30 (2d Cir. 2012) (emphasis omitted) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986)), "and cannot rely on the mere allegations or denials contained in the pleadings," *Guardian Life Ins. Co. v. Gilmore*, 45 F. Supp. 3d 310, 322 (S.D.N.Y. 2014) (internal quotation marks omitted); *see also Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009) ("When a motion for summary judgment is properly supported by documents or other evidentiary materials, the party opposing summary judgment may not merely rest on the allegations or denials of his pleading . . . ."). And, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

"On a motion for summary judgment, a fact is material if it might affect the outcome of the suit under the governing law." *Royal Crown Day Care LLC v. Dep't of Health & Mental Hygiene*, 746 F.3d 538, 544 (2d Cir. 2014) (internal quotation marks omitted). At this stage, "[t]he role of the court is not to resolve disputed issues of fact but to assess whether there are any

factual issues to be tried." *Brod*, 653 F.3d at 164 (internal quotation marks omitted). Thus, a court's goal should be "to isolate and dispose of factually unsupported claims." *Geneva Pharm. Tech. Corp. v. Barr Labs. Inc.*, 386 F.3d 485, 495 (2d Cir. 2004) (internal quotation marks omitted) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986)). However, a district court should consider only evidence that would be admissible at trial. *See Nora Beverages, Inc. v. Perrier Grp. of Am., Inc.*, 164 F.3d 736, 746 (2d Cir. 1998). "[W]here a party relies on affidavits . . . to establish facts, the statements 'must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant . . . is competent to testify on the matters stated.'" *DiStiso v. Cook*, 691 F.3d 226, 230 (2d Cir. 2012) (quoting Fed. R. Civ. P. 56(c)(4)).

Finally, the Second Circuit has instructed that when a court considers a motion for summary judgment, "special solicitude" should be afforded a pro se litigant, *see Graham,* 848 F.2d at 344; *Mercado v. Div. of N.Y. State Police,* No. 96-CV-235, 2001 WL 563741, at *7 (S.D.N.Y. May 24, 2001) (same), and a court should construe "the submissions of a pro se litigant . . . liberally" and interpret them "to raise the strongest arguments that they suggest," *Triestman v. Fed. Bureau of Prisons,* 470 F.3d 471, 474 (2d Cir.2006) (italics and internal quotation marks omitted). And, "the failure to oppose a motion for summary judgment alone does not justify the granting of summary judgment." *Vermont Teddy Bear Co.*, 373 F.3d at 244; *see also Jackson v. Fed. Exp.*, 766 F.3d 189, 196 (2d Cir. 2014) (explaining that "an examination of the legal validity of an entry of summary judgment should . . . be[] made in light of the opposing party's pro se status" (italics omitted)). "Nonetheless, proceeding pro se does not otherwise relieve a litigant of the usual requirements of summary judgment, and a pro se party's bald assertions unsupported by evidence . . . are insufficient to overcome a motion for summary

judgment." *Houston*, 27 F. Supp. 3d at 351 (alterations, italics, and internal quotation marks omitted); *see also Flores v. City of New York*, No. 15-CV-2903, 2017 WL 3263147, at *2 (S.D.N.Y. July 31, 2017) (same).

### B. Analysis—Excessive Force

#### 1. Applicable Law

Defendant argues that there is no dispute of material fact as to whether he used excessive force against Plaintiff. (Def.'s Mem. Of Law in Supp. of Mot. for Summ. J. ("Def.'s Mem.") (Dkt. No. 121) 8–14.) Because Plaintiff was a pre-trial detainee rather than a convicted prisoner at the time he was allegedly subjected to excessive force, (*see* Def.'s 56.1 ¶ 6; Pl.'s Dep. 16), his claim falls under "the Due Process Clause of the Fourteenth Amendment, rather than the Cruel and Unusual Punishments Clause of the Eight[h] Amendment," *Darnell v. Pineiro*, 849 F.3d 17, 29 (2d Cir. 2017). To state a claim for excessive force under the Due Process Clause, Plaintiff must allege that (1) the force used was "deliberate"—in other words, "purposeful," "knowing," or "possibly [] reckless"—"not accidental[] or negligent[]"; and (2) "the force purposely or knowingly used against him was objectively unreasonable." *Kinglsey v. Hendrickson*, 135 S. Ct. 2466, 2472–73 (2015).

Because "the relevant standard is objective not subjective . . . the defendant's state of mind is not a matter that a plaintiff is required to prove." *Kingsley*, 135 S. Ct. at 2472. Rather, a plaintiff must show that the force was "not rationally related to a legitimate governmental objective or that it [was] excessive in relation to that purpose." *Id.* at 2473–74. In describing when the use of force is objectively unreasonable, the Supreme Court has explained that:

> [O]bjective reasonableness turns on the facts and circumstances of each particular case. A court must make this determination from the perspective of a reasonable officer on the scene, including what the officer knew at the time, not with the 20/20 vision of hindsight. A court must also account for the legitimate interests that stem

from [the county] government's need to manage the facility in which the individual is detained, appropriately deferring to policies and practices that in the judgment of jail officials are needed to preserve internal order and discipline and to maintain institutional security.

*Id.* at 2473 (alterations and internal quotation marks omitted). This analysis is driven by the recognition "that running a prison is an inordinately difficult undertaking, and that safety and order at these institutions requires the expertise of correctional officials, who must have substantial discretion to devise reasonable solutions to the problems they face." *Id.* at 2474 (alteration, citations, internal quotation marks omitted). Factors to consider in determining the objective reasonableness of the use of force include, but are not limited to:

the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting.

*Id.* at 2473.

## 2. Plaintiff's Excessive Force Claim

It is undisputed that Defendant used force at some point against Plaintiff. (*E.g.*, Def.'s Mem. 13 ("[T]here is no dispute that force was used by [Defendant].") Therefore, the Court must decide whether there is a dispute of material fact regarding whether the force used was "objectively unreasonable." *Kingsley*, 135 S. Ct. at 2473. Construing Plaintiff's deposition in the light most favorable to him, he claims that Defendant used excessive force against Plaintiff (1) inside his cell, by bashing Plaintiff's head against the wall, grabbing him by the neck and choking him, and picking him up by his handcuffs; (2) outside his cell, by pushing him and smashing his head against the wall, choking him, and handcuffing him tightly; and (3) also inside his cell, by putting him in a chokehold and trying to break his arm. The Court will consider

these claims in light of the entire record, but notes that all but a fraction of the relevant time period is captured on video.

Plaintiff initially testified that Defendant arrived at his cell with the ERT, bearing shields and helmets, and immediately attacked him. (*See* Pl.'s Dep. 56, 59–60, 79.) He specifically testified that Defendant was part of the "turtle unit," meaning the ERT. (*Id.* at 56–57, 71–72.) However, the video evidence, corroborated by numerous officer affidavits and reports, thoroughly belies Plaintiff's testimony. The video of the 1-G block hallway shows Defendant arriving at Plaintiff's cell with only one other officer—Coaxum—at 7:18:10 am, without any ERT officers or any of the equipment they carry. (Camera 7 at 7:18:10 am.) The ERT officers, carrying this equipment and wearing distinct uniforms, did not arrive at Plaintiff's cell until 7:23:22 am. (Camera 7 at 7:23:22 am.) The video also contradicts Plaintiff's testimony that Defendant immediately attacked him in his cell. (*E.g.,* Pl.'s Dep. 59 (testifying that Defendant "attacked [him]" upon entering his cell).) Rather, Defendant is shown backing Plaintiff out his cell in handcuffs and directing Plaintiff to stand facing the hallway wall while Coaxum remained inside Plaintiff's cell. (Camera 7 at 7:18:40.)[13] This video evidence is corroborated by Defendant's sworn affidavit. (*See* Cosgriff Decl. Ex. 5 ("Morton Aff.") ¶ 7 ("[O]n August 12, 2011, I was posted as a Special Search Team, to conduct routine searches and I was not acting as

---

[13] Plaintiff at one point testified that he was handcuffed "[i]mmediately" upon leaving his cell. (Pl.'s Dep. 109.) Given that he is standing facing the wall in the hallway with his hands behind him like all of the other inmates in the video, he was likely handcuffed before he left his cell. However, construing the record in the light most favorable to him, the Court credits his testimony that he was not. In any event, Plaintiff later testified that the handcuffing injuries he suffered were as a result of being picked up by the handcuffs, not the mere act of handcuffing. (Pl.'s Dep. 114.) Thus, this act alone does not constitute excessive force. *See Dunkelberger v. Dunkelberger*, No. 14-CV-3877, 2015 WL 5730605, at *14 (S.D.N.Y. Sept. 30, 2015) (explaining that "there is a consensus among courts in the Second Circuit that tight handcuffing does not constitute excessive force unless it causes some injury beyond temporary discomfort" (alteration and internal quotation marks omitted)).

a member of ERT."); *id.* ¶ 9 (At approximately 7:18 am, CO Coaxum and I approached

Plaintiff's cell door . . . I handcuffed Plaintiff and I backed him out of his cell without incident . .

. CO Coaxum entered his cell to search it.").)

Plaintiff's version of events later in his deposition more closely resembles the events

depicted in the hallway video. Plaintiff testified that Defendant initially asked him to "step out"

of his cell into the hallway, which he did. (Pl.'s Dep. 60, 61–62, 103–04.) However, what

Plaintiff contends happened next—namely, that Defendant pushed and slammed his face against

the wall and choked him *while in the hallway*—is again directly contradicted by the video. (*See*

Pl.'s Dep. 60, 62, 64, 106, 110–11.) Rather, the video shows that Plaintiff was standing, facing

the wall, from approximately 7:19 am until 7:21:26 am. (Camera 7 at 7:19–7:21:26 am.)

Although the image is not clear enough to see precisely what Defendant is doing, it is clear

enough to show that no one in the hallway—the inmates or the officers—made any substantial

movements. (*See id.*) And, while Defendant acknowledges that he pat frisked Plaintiff at

7:19:36 am, (*see* Def.'s 56.1 ¶ 19; Camera 7 at 7:19:36 am), as of 7:20:20 am, Plaintiff is the

only inmate standing in the hallway, and it is clear that he is not touching the wall and no officers

are closer than a few feet away from him, (Camera 7 at 7:20:20 am). Therefore, Plaintiff's

testimony that Defendant was choking him or otherwise using force against him for *more than 5*

*or 10 minutes* in the hallway, (Pl.'s Dep. 67–68, 107, 111), is thoroughly disproven by the

video.[14] Even if Plaintiff could substantiate his assertion that his head was pushed into the wall

---

[14] Plaintiff testified repeatedly that when he told Defendant about his injuries and told him he did not need to use force, Defendant told Plaintiff to "[s]hut the eff up." (*See* Pl.'s Dep. 60, 62, 67, 110.) Because the video has no sound, and therefore does not contradict this testimony, the Court credits it. However, it is possible that Plaintiff confused this interaction with Defendant with his later interaction with the ERT officer who held him against the wall and told him to be quiet. (*See* ERT Video 1 at 1:47–1:51.) In any event, the mere fact that Defendant told Plaintiff to shut up, without more, does not constitute an objectively unreasonable

or he was choked during this brief pat and frisk, courts have found such force to be "de minimis" rather than excessive. *See Armand v. Bartlett*, No. 11-CV-4182, 2016 U.S. Dist. LEXIS 17236, at *29–30 (E.D.N.Y. Feb. 10, 2016) (collecting cases), *adopted by* 2016 U.S. Dist. LEXIS 47853 (E.D.N.Y. Apr. 6, 2016); *Vogelfang v. Capra*, 889 F. Supp. 2d 489, 507 (S.D.N.Y. 2012) (concluding that pushing an inmate against a wall to pat-frisk her is "a degree of roughness that is common in prison contexts" and listing cases holding that force used in conjunction with pat frisks is not excessive); *Tavares v. City of New York*, No. 08-CV-3782, 2011 WL 5877550, at *6 (S.D.N.Y. Oct. 17, 2011) (collecting cases holding that "actions taken consistent with a forceful pat frisk" amount to only de minimis use of force), *adopted by* 2011 WL 5877548 (S.D.N.Y. Nov. 23, 2011).[15]

The video shows Plaintiff being directed back into his cell, while wearing handcuffs, at approximately 7:21 am. (Camera 7 at 7:21:26–7:21:32 am.) After Plaintiff enters his cell, he is no longer visible, but Defendant is seen standing in the doorway until approximately 7:21:57 am. (*Id.* at 7:21:26–7:21:57 am.) What transpired in the following minute and 56 seconds is the only part of the events relevant here that was *not* captured on video. (*See* Camera 7 at 7:23:22 am (showing the ERT arrive); ERT Video 1 (beginning when the ERT arrives at Plaintiff's cell).) Defendant proffers that, while attempting to remove Plaintiff's handcuffs, he used force only when Plaintiff ignored his order, twice, to place his left hand on his head, and then "made a

---

use of force. *See, e.g.*, *Bancroft v. City of Mount Vernon*, 672 F. Supp. 2d 391, 404 (S.D.N.Y. 2009) (concluding that when "a police officer yelled at [a] child and told her to shut up," it was "rude, but it [did] not constitute an application of physical force").

[15] The Court recognizes that one could attempt to distinguish pushing or pressing an inmate's head against the wall from "slamming" it against the wall. However, the Court is aware of no case making such a distinction, and in any event, the video belies Plaintiff's contention that his head was slammed into the wall for any period of time, let alone a prolonged one.

sudden turn to the right towards [Defendant] while raising his left arm above his head with a clenched fist." (Def.'s 56.1 ¶¶ 21–22.) Defendant claims he placed his left forearm on Plaintiff's upper back and used minimal force to guide Plaintiff's face down to the bed in front of him, after which he grabbed Plaintiff's left arm and ordered him to put his left hand behind his back. (*Id.* ¶ 22.) Plaintiff "actively resisted" by "tens[ing] his left arm to attempt to prevent [Defendant] from handcuffing him," (*id.*), at which point Captain Diaz, who is seen on video entering Plaintiff's cell, (Camera 7 at 7:22 am), also gave Plaintiff an order to place his hand behind his back, (Diaz Aff. ¶ 4). Defendant contends that he "then reapplied the left handcuff and maintained control of Plaintiff." (Def.'s 56.1 ¶ 22.) At this point, the ERT, which had been activated via an "officer-needs assistance alarm" at 7:22 am, (*id.* ¶¶ 24–25), arrived and "took control of . . . Plaintiff," at which point Defendant left Plaintiff's cell, (*id.* ¶ 23; *see also id.* ¶ 30 (same); Camera 7 at 7:23:27 am (showing officers leaving Plaintiff's cell after the ERT went in).)

Plaintiff's account of what occurred in his cell differs wildly from Defendant's, but is also internally inconsistent throughout his deposition and contradicted by other events that are on video. First, as described earlier, Plaintiff testified that Defendant came to his cell with the ERT and began slamming his face into the wall, twisting his arm, putting elbows in his back and ordering him to get undressed. (Pl.'s Dep. 57.) Again, the video contradicts these claims, because Defendant did not enter Plaintiff's cell and begin attacking him, nor did he arrive with the ERT. Indeed, Plaintiff testified multiple times that all of these events were filmed by an ERT officer, referring to the handheld video taken by Officer Valles. (*See* Pl.'s Dep. 58 (explaining that another officer "had his own video camera" and "was videoing everything"); *id.* at 60–61 ("He did the same thing in my cell that he did outside. Once he got me in the cell—it's

on videotape. Like I said, [an officer] had his own personal tape, and it's on jail surveillance."); *id.* at 68 ("The whole incident is on tape.").) But, that video does not begin until the ERT arrives, at which point Defendant left Plaintiff's cell. (Def.'s 56.1 ¶¶ 23, 30; *see also* Camera 7 at 7:23:27 am (showing officers leaving Plaintiff's cell after the ERT went in).)

In fact, it appears that all of Plaintiff's testimony about Defendant's actions inside his cell refers to events occurring after the ERT arrived, not before, when Defendant admits to having used force. For example, Plaintiff testified that multiple officers "took [him] back in the cell," where Defendant "[m]ade [him] get undressed." (Pl.'s Dep. 68.) However, when the multiple other officers—the ERT—arrived, *after* Defendant had been alone in Plaintiff's cell with him, the handheld video shows that Plaintiff was still fully clothed and handcuffed, lying face down on his bed. (ERT Video 1 at 0:48–1:02; *see also* Def.'s 56.1 ¶ 30 (same).) Similarly, Plaintiff testified that when Defendant "tried to break [his] arm" and put him in "a chokehold" on the bed, "most of the officers [were] in the cell at that time" and the ERT officer was filming with the hand-held camera. (Pl.'s Dep. 69; *see also id.* at 57 (testifying that other officers gave Defendant "assistance"); *id.* at 113–14 (testifying that the other ERT officers picked Plaintiff up by the leg irons and handcuffs while Defendant had him by the handcuffs and neck).) However, these facts are simply impossible in light of the time stamps on the videos—there is no time period in which Defendant was with other ERT officers inside Plaintiff's cell that is not captured on video.[16] Moreover, Plaintiff testified that Defendant is the one who pushed him up against the

---

[16] Indeed, Plaintiff at least a few times testified that he was not alone with Defendant, another fact that is inconsistent with the video. (Pl.'s Dep. 107 (responding to question "So you were with [Defendant] alone for ten minutes?" with "No. It was Officer Rome, and maybe another turtle. Maybe two turtles–three turtles in my cell."); *id.* at 109 (testifying again that there were other officers "in full riot gear" with him and Defendant outside his cell).; *id.* at 60 (testifying that Defendant "entered with the turtle crew" and then "[t]hey put me on the wall").)

wall in the back of his cell. (*Id.* at 56–67, 70, 78.) However, Plaintiff also testified that Defendant was not "wearing the . . . head gear" the other ERT members were wearing. (Pl.'s Dep. 72; *see also id.* at 58 ("[Defendant] didn't have everything [that] [the ERT officers] have. He had on his uniform. . . . They had on their shields and helmets.").) But, the handheld video clearly shows that an ERT officer with the head gear was the one holding him on the wall outside *and* inside his cell. (*See, e.g.*, ERT Video 1 at 1:33; *id.* at 3:05; *see also* Cosgriff Decl. Ex. 9 at 507 (incident report stating that Officer Ficarrotta escorted Plaintiff outside his cell).) Therefore, Plaintiff's own testimony contradicts his claim that *Defendant* held him on the wall with force, whether it was inside or outside his cell.

Even assuming that Plaintiff misspoke, and that Defendant was wearing the ERT gear, the events he is testifying to—when multiple officers are in his cell and when he is again held on the wall outside of his cell—are captured on the handheld video. Plaintiff was held against the wall while telling the officer about his injuries, telling him there was "no reason for [them] to do this" and to "push [him] up like a mother fucking dog," to which the officer said, "nobody's doing anything, be quiet." (ERT Video 1 at 1:11-2:15; *see also* Camera 7 at 7:24:04 am (putting Plaintiff against the wall).) After approximately one minute, Plaintiff was brought back into his cell, where he was directed to stand facing the back wall and to undress so he could be searched. (ERT Video at 2:15 –5:43.) After the search was finished, the ERT directed Plaintiff to lay face down on his bed, and they left his cell. (*Id.* at 5:43–6:05.) The ERT was inside Plaintiff's cell for no more than 4 minutes. (*Id.* at 2:16–6:00; *see also* Camera 7 at 7:25:09–7:29:02 am (showing the ERT entering and exiting Plaintiff's cell).) At no point during this video, either inside or outside of Plaintiff's cell, does Defendant—or any other ERT officer, for that matter—bash Plaintiff's head against the wall, (*see* Pl.'s Dep. 56–57, 70, 78), place Plaintiff in a

chokehold on the bed or try to break his arms, (*id.* at 69, 78), or pick Plaintiff up by the handcuffs and the neck, (*id.* at 57, 113–14). While an officer placed a hand on Plaintiff's neck and back while he was facing the wall inside and outside his cell, no reasonable juror could find such touching to be objectively unreasonable. (*See* ERT Video 1 at 1:11–6:00.) *See Kinglsey*, 135 S. Ct. at 2473–74 (explaining that force is objectively unreasonable when it is "not rationally related to a legitimate governmental objective or . . . excessive in relation to that purpose").

As is obvious from the above recitation of Plaintiff's deposition testimony, Plaintiff's version of events is replete with internal inconsistencies and impossibilities in light of the video evidence. The Court therefore concludes that Plaintiff's testimony, which is unsubstantiated by any other evidence, is "so replete with inconsistencies and improbabilities that no reasonable juror would undertake the suspension of disbelief necessary to credit the allegations made in his complaint." *Jeffreys v. City of New York*, 426 F.3d 549, 555 (2d Cir. 2005) (internal quotation marks omitted); *id.* at 555 (noting that nothing in the record supported the plaintiff's version of events other than his "own contradictory and incomplete testimony"); *Houston*, 27 F. Supp. 3d at 351 ("[A] pro se party's bald assertions unsupported by evidence . . . are insufficient to overcome a motion for summary judgment." (italics and internal quotation marks omitted)); *Jeffreys v. Rossi*, 275 F. Supp. 2d 463, 476 (S.D.N.Y. 2003), *aff'd sub nom. Jeffreys v. City of New York*, 426 F.3d 549 (2d Cir. 2005) (collecting cases holding that "when evidence is so contradictory and fanciful that it cannot be believed by a reasonable person, it may be disregarded"). This conclusion is particularly apt when the videos of undisputed authenticity directly contradict Plaintiff's testimony. *See Scott*, 550 U.S. at 380 ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a

motion for summary judgment."); *Zellner v. Summerlin*, 494 F.3d 344, 371 (2d Cir. 2007) ("Incontrovertible evidence relied upon by the moving party, such as a relevant videotape whose accuracy is unchallenged, should be credited by the court on [a motion for summary judgment] if it so utterly discredits the opposing party's version that no reasonable juror could fail to believe the version advanced by the moving party."); *Dobbins v. Ponte*, No. 15-CV-3091, 2017 WL 3309726, at *5 (S.D.N.Y. Aug. 2, 2017) (holding that "the video makes clear that the force used to restrain [the plaintiff] was not objectively unreasonable" (internal quotation marks omitted)); *Merring v. The Town of Tuxedo, N.Y.*, No. 07-CV-10381, 2009 WL 849752, at *10 (S.D.N.Y. Mar. 31, 2009) ("[W]here the nonmoving party's version of the facts is blatantly contradicted by the existence in the record of a videotape capturing the events in question, then the court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." (internal quotation marks omitted)). Therefore, to the extent Plaintiff's contradictory deposition testimony could be construed as raising a dispute of material fact here, the Court does not credit it, because "a party cannot rely upon implausible testimony to create a triable issue of fact." *Jeffreys*, 275 F. Supp. 2d at 477 (collecting cases). Indeed, "permitting [Plaintiff] to present such incredulous testimony at trial would be a terrible waste of judicial resources and a fraud on the court." *Id.* at 477–78.

The Court emphasizes that Plaintiff *could* have raised a dispute of material fact as to whether he was subjected to excessive force in the short time that he was with Defendant in his cell, before the ERT arrived. However, Plaintiff's deposition testimony does not identify a time in which Defendant, acting alone or with only one other officer, such as Diaz or Coaxum, took these actions inside Plaintiff's cell, outside of the camera range, before the ERT arrived. Indeed, the Complaint alleged that Defendant acted in tandem with the ERT. (*See* Second Am. Compl. 5

¶ 3.)  Therefore, although Court is willing to credit Plaintiff's testimony that he never disobeyed an order, (*see* Pl.'s Dep. 75 ("I didn't refuse anything."); *id.* at 97 ("There was a . . . false report claiming that I didn't follow an order or something."); *id.* at 110 ("I was compliant.  I didn't break any rule.")), Plaintiff has failed to dispute Defendant's version of events, corroborated by other witnesses and reports—that in the only instance in which he used force, he believed Plaintiff posed a physical threat and was not obeying an order, resulting in him using limited force to bring Plaintiff to the bed and handcuff him, (Def.'s 56.1 ¶¶ 21–22; Diaz Aff. ¶ 4; Cosgriff Decl. Ex. 9 at 501 (Coaxum Witness Statement)).[17]  Therefore, the Court grants Defendant's Motion for Summary Judgment on Plaintiff's excessive force claim.[18]

---

[17] Defendant argues that the undisputed medical evidence disproves Plaintiff's excessive force claim because it does not document any serious injuries.  (Def.'s Mem. 13–14.)  It is true that Plaintiff received no medication or treatment the day of the incident aside from Motrin, had normal spine x-rays, and offered no medical evidence showing he suffered a new injury or exacerbation of his old injuries.  (*See* Def.'s 56.1 ¶¶ 34, 38; Pl.'s Medical Records 250–25.)  However, these records also show that Plaintiff complained of pain and sought treatment and therapy after the incident, and he also testified to that effect.  (*See* Pl.'s Medical Records 250–25; Pl.'s Dep. 74, 84–85, 100, 114.)  The Court therefore declines to grant summary judgment on this basis.  *See Dobbins*, 2017 WL 3309726, at *5 (finding the fact that the plaintiff "sought additional medical treatment," complained of pain, and "was treated for an abrasion on his right wrist" created a factual dispute regarding whether excessive force was used, even if "he was not diagnosed with serious injuries at any time").  However, these records do not create a material fact dispute, either, as they do not establish that Defendant was responsible for any injuries Plaintiff claims he suffered, or that any force used was excessive.

[18] Because the Court concludes that there is no dispute of material fact regarding whether Defendant used excessive force, it need not reach Defendant's alternative argument that he is entitled to qualified immunity.  (*See* Def.'s Mem. 14–15.)

## III. Conclusion

For the foregoing reasons, Defendant's Motion for Summary Judgment is granted. The

Clerk of Court is respectfully directed to terminate the pending Motion, (Dkt. No. 118), enter

judgment for Defendant, close this case, and mail a copy of this Opinion to Plaintiff.

SO ORDERED.

DATED:    March **9**, 2018
          White Plains, New York

KENNETH M. KARAS
UNITED STATES DISTRICT JUDGE